## Scranton City, Appellant, *v.* Phillips.

*Road law—Mining coal under street—Municipalities—Police power.*

Where an owner of land sells the surface but reserves the right to mine the coal without responsibility for surface support, and thereafter the vendee dedicates and conveys a portion of the land to a municipality for a public street, and the municipality accepts the land for that purpose, the owner of the coal cannot be restrained by an ordinance regulating the mining of coal under streets, from removing the coal under the street in question, although such removal affects surface support.

Argued April 22, 1914. Appeal, No. 40, March T., 1914, by plaintiff, from order of Q. S. Lackawanna Co., Jan. T., 1913, No. 241, sustaining appeal in City of Scranton *v.* R. A. Phillips. Before RICE, P. J., HEAD, PORTER, HENDERSON, KEPHART and TREXLER, JJ. Affirmed.

Appeal from judgment of justice of the peace.

NEWCOMB, J., filed the following opinion:

The case arises under an ordinance of this city approved July 24, 1912, purporting to regulate the mining and removal of coal or other minerals under its public streets. In substance, sec. 1 makes it unlawful to do any mining in such areas "recklessly, carelessly and to such extent and in such manner . . . . as to threaten, endanger or interfere with the use thereof by the public; or endanger the safety of said streets," etc.

The penal provision, however, is sec. 2 which varies

the terms somewhat. It prescribes a maximum penalty of $100 to be recovered by summary proceedings—with imprisonment for thirty days in default of payment—for mining and removing the coal "or other minerals forming the natural support of the surface beneath the several streets, avenues," etc., "to such extent and in such manner as to thereby remove the necessary adequate support of the surface against subsidence, without having first" replaced the same with permanent artificial support adequate to the purpose.

The terms of defendant's conviction covered both reckless mining and removal of the coal to such extent as to cause subsidence. So far as concerns any question of negligence, this is contrary to the undisputed facts which were before the magistrate by formal agreement of the parties in writing.

The operations were those of the Delaware, Lackawanna and Western Railroad—hereinafter called the Lackawanna Company, which were being carried on in the exercise of its unquestioned right of property without liability for surface injuries, provided such exemption can be had by explicit agreement of the parties in interest before any attempt to open a street on the surface to which the city eventually succeeded by mere dedication of the rights of the surface owner.

In that situation the city claims to have enacted the ordinance in the exercise of its police power in and about the maintenance of its highways in a reasonably safe condition for public travel.

This gives rise to what is probably the most important question discussed by counsel, viz., whether in any event such ordinance could be classified as a regulation of the use either of the streets or of private property adjacent thereto, and thus supported on the basis asserted by the city. Taking the negative, defendant attacks it as ultra vires.

Whether so or not is a matter of no small moment, and, as affecting the interest of both person and prop-

erty in this city, is serious enough so that its determination ought not to be undertaken until it arises in a case where its decision becomes necessary. For, if in general the existence of such municipal power be granted, it could not apply to the specific facts of this case.

The place selected for the test may have been unfortunate; as it has impelled counsel to call in question the sincerity of the proceeding and to impugn the good faith of the ordinance itself as a merely colorable and delusive semblance of remedy against mine caves at a time when popular apprehension on the subject has become acute. With the merits of that criticism we have nothing to do. It is only noted as emphasizing the point that for present purposes the locus in quo was ill-chosen.

The street with which the case is concerned is Roberts court between Pettebone street and Schlager boulevard as designated on map or plan of West Park hereinafter mentioned. Defendant is connected with the alleged offense only by virtue of his relation with the Lackawanna Company as the general manager of its coal mining department. These streets are on the surface of an extensive tract of land, to the westerly of North Main avenue, long owned by the company in fee which it has been mining many years. They were first laid out and opened since 1899 by the persons to whom a surface parcel had been sold by the company, as stated below. More recently, as so laid out, the streets were by these vendees dedicated to the city. A little attention, therefore, to the origin of Roberts court and the nature and extent of the rights which its proprietors had to dedicate, must dispel any notion that the mining of the subsurface is subject to regulation at the hands of the city.

By indenture of August 9, duly recorded August 11, 1899, the surface or right of soil in a parcel of 121.12 acres was severed in title and conveyed by the Lackawanna Company to John T. Porter and George F. Reynolds. This was a bipartite deed excepting and

reserving all coal and other minerals with unlimited mining rights to be exercised by the grantor with the like immunity as if the grant had not been made, and without the burden of either, vertical or lateral support or liability for damages for injury to the surface or the improvements thereon whether occasioned by negligent mining or otherwise, save only as to the right to make openings or place mining fixtures on the surface, which was excluded. Among other mutual covenants, the parties were at pains to agree that the surface was so accepted by the grantees with full knowledge of the mining which had been done in the past and was to be continued in the future to the extent of exhausting the coal, without the duty of surface support, and with the possible result of injury to the surface and destruction of any improvements thereon, for which the damages were by the grantees for themselves and their successors in title, fully satisfied in consideration of a material reduction of the purchase price on that account.

In short, it is not disputed that as between the parties, and all other persons merely claiming title under them, the terms of this conveyance were entirely apt to, and in law did, extinguish any right of support, and that the surface was thus taken wholly at the grantees' risk, without remedy in any event for subsidence either actual or imminent.

It is equally undisputed that by merely throwing the surface open to the use of the traveling public, whether by regularly laid out streets or otherwise, these surface owners could not vary the rights and liabilities of their grantor. But it was so opened. Porter and Reynolds plotted a portion into building lots and called it West Park. Up to that time that area had been in solid acreage without streets or highways. They opened and to some extent improved the streets above mentioned, inter alia, Roberts court. Afterwards, in 1902, they offered to dedicate them to the city. The offer was accepted by ordinance of December 12, that year, not

to become effective, however, until the streets should be graded to the satisfaction of the department of public works, and such time as "a proper dedication of the land to be used for street purposes is submitted to the Recorder" (now mayor) "of the city of Scranton and recorded in the office for recording deeds," etc.

What was evidently deemed a "proper dedication" followed in form of a quitclaim deed of the streets, avenues, etc., to the city, dated March 18, approved by the Director of Public Works April 15, 1903.

This was afterwards recorded, but just when does not appear.

It is quite obvious that so far as the city's status depends upon its rights as successor in title to Porter and Reynolds, it could get no more than they had to grant: Hence, if its "powers" in the premises are commensurate only with the "rights" of the traveling public as derived from that dedication it has no standing to enforce a demand for surface support, either by regulating the operations of the subsurface owner, or otherwise.

By paragraph 12 of the facts agreed upon it is stipulated that: "The only right the city has to the use of the land covered by Roberts court is that acquired by the conveyance from Porter and Reynolds, or right it acquired by reason of the opening and dedication of that portion of the land acquired by Porter and Reynolds from the D., L. & W. Co. by deed of August 9, 1899, for street purposes."

This is manifestly true.

Thus the city assumes the burden of showing that while as a conveyance the Porter and Reynolds grant operated only at its face value, yet as a dedication to public use it served to reinvest the streets with the right of support, in spite of all that had been said in their covenants to the contrary at the inception of their title.

The attempt is illusory and hopeless. The stream cannot rise higher than its source.

It would be erroneous to suppose that, being of wide

scope and in its nature incapable of exact definition, the police power of the city is therefore unlimited. Nor, indeed, does the learned city solicitor go that length. One may refer to what is pertinently said on the point in his brief, viz.: "That the interest of the public must actually require the interference of the authorities, and the means adopted must be reasonably necessary and not unduly oppressive upon individuals."

This is quite true though amounting only to a broad generalization. And as such the pointed question arises: How can it be said either that the present form of interference is "actually required" or that such ordinance is "reasonably necessary" in a case where the city may stop the mining at any moment by appropriating the land?

One very definite limitation, however, is mentioned in the so-called "general welfare" clause of the city charter which must govern in this particular instance. The reference is to art. XIX, par. 43, Act of March 7, 1901, P. L. 20. This is the source of the city's authority in the matter. It clothes the city with power to enact "all such ordinances, by-laws and regulations, not inconsistent with the constitution and laws of this commonwealth," etc. In order that the franchises of the city should be held in subordination to the organic law of the state from which it derives its existence, express mention was by no means necessary. But being expressed it can at least be given credit for serving the purpose of putting all parties on notice.

How, then, as applied here can the enforcement of this ordinance be reconciled with the constitutional provision against the gratuitous taking of or injury to private property for public use?

It is idle for the city to say: "No property has been taken or injured; it is the mere use thereof by the owner that is regulated; and this the city does as a matter of necessity to secure the public safety."

In form only this might be conceded to be true; in

substance and effect it is quite otherwise.  It would be intolerable trifling with the constitution if, having the sovereign power of appropriation, the city could enjoy its practical benefits and yet evade the burden that goes with it, by enforcing this ordinance wholly at the expense of private property on the theory of necessity.

Counsel refers to those ordinances, admittedly valid, which regulate awnings, projecting signs, poles, wires, etc.

The analogy is invalid.

So far as the overground air space may be regarded as the subject of private property, it necessarily attaches to the surface.  As such it would pass with a change of proprietorship either by grant or dedication.  Whether it could for any practical purpose be severed in title is at least doubtful.  At all events in the absence of any known example to the contrary it must be presumed that no attempt has ever been made to regulate the overground use of a street area where anything like divided ownership had to be dealt with.

In case of highways entitled to the servitude of support, no doubt the city could enforce the public right to such easement by proceedings to enjoin against any disturbance thereof; and it is not intended to say that acts of disturbance in such case are not a proper subject of penal regulation imposed by municipal ordinance. Hence, the general question as to the validity of this ordinance in such cases is not now determined.  All that is decided is that it must be deemed to apply only to such streets, avenues, courts, etc., as are public highways to all legal intents and purposes; and not to an exceptional case of this kind where neither the public nor the city can show the existence of a street without showing that it originated and was by the city acquired under conditions which precluded both the city and the traveling public from claiming any right of surface support; that the city so accepted it with full knowledge; and that in the meantime it has been content to have it so remain without effort to acquire any further right.

It was the city who sat in judgment on the sufficiency of the dedication; she saw fit to accept as "a proper dedication of the land to be used for street purposes" a grant from those who were proprietors of the surface, and the surface only, stripped of every vestige of claim to support. There was no concealment of any material fact. The deed under which her grantors held had long since been recorded. It called attention very pointedly to the subject of underground mining and the risk of subsidence, which Porter and Reynolds were willing to . take upon getting their price. It was they who opened the streets; not the city. The latter was at pains to require them to complete the grading before taking them over.

Porter and Reynolds could dedicate whatever they had; but they could not dispose of their neighbor's property. To the extent of their proprietorship there was "a proper dedication." But that did not extend far enough to subject the underlying property to the exigency of this ordinance.

The appeal is sustained; and judgment is entered for defendant.

*Error assigned* was the order of the court.

David J. Davis, city solicitor, for appellant.—In the absence of any prohibition in the deed of the land being used for street purposes, no reservation or condition could be annexed which would defeat the dedication or destroy its character as a public street: Smith v. City of Goldsboro, 28 S. E. Repr. 479; City of Denver v. Clements, 3 Colo. 472; Trustee of Methodist Episcopal Church v. The Mayor, 33 N. J. Law, 13; Des Moines v. Hall, 24 Iowa, 234; Jackson v. Hartwell, 8 Johns. (N. Y.) 422.

And in Pennsylvania streets and roads are public highways under the control of cities and towns, subject to the paramount authority of the commonwealth: South-

wark R. R. Co. v. Phila., 47 Pa. 314; Branson v. Phila., 47 Pa. 329; Phila. v. P. & R. R. Co., 58 Pa. 253; Smith v. City of Goldsboro, 28 S. E. Repr. 479.

All authorities agree that the constitution presupposes the existence of the police power, and is to be construed with reference to that fact: Munn v. Illinois, 94 U. S. 113; People v. Gillson, 109 N. Y. 389; Boston Beer Co. v. Massachusetts, 97 U. S. 25.

A municipality has no right to enter into a contract which· interferes with its duties to preserve the health and morals of the city: Western Saving Fund Society of Phila. v. Phila., 31 Pa. 175; Scranton Gas & Water Co. v. Scranton City, 214 Pa. 586; Radnor Twp. v. Bell, 27 Pa. Superior Ct. 1; Penna. R. R. Co. v. Ewing, 241 Pa. 581.

*Everett Warren,* with him *D. R. Reese,* for appellee.— There is no doubt under the law of this state that the deed from the D., L. & W. to Porter and Reynolds of August 9, 1899, was valid ·in all its provisions, and conveyed to Porter and Reynolds only surface rights, reserving to the grantor the right to mine and remove the coal without liability for surface subsidence.   The validity of a reservation of this sort has been affirmed many times by our appellate courts: Stilley v. Pittsburg-Buffalo Co., 234 Pa. 492; Kellert v. Rochester, etc., Coal & Iron Co., 226 Pa. 27; Miles v. Penna. Coal Co., 217 Pa. 449; Madden v. Lehigh Valley Coal Co., 212 . Pa. 63; Scranton v. Phillips, 94 Pa. 15; Moreland v. Frick Coke Co., 170 Pa. 33; Algonquin Coal Co. v. N. C. & I. Co., 162 Pa. 114; Plummer v. H. C. & I. Co., 160 Pa. 483; Pierce v. Roberts, 57 Conn. 31; Clark v. City of Providence, 10 R. I. 437; State of New Jersey v. Mayor of Vineland, 23 L. R. A. 685.

The ordinance, if held to be applicable to the facts of the case, is unconstitutional and void: Grand Rapids Booming Ço. v. Jarvis, 30 Mich. 308; The Slaughterhouse Cases, 83 U. S. 36; Munn v. Illinois, 94 U. S.

113; Searle v. Lacka. & Bloomsburg R. R. Co., 33 Pa. 57; Hasson v. Oil Creek, etc., R. R. Co., 8 Phila. 556; Spring Brook Water Supply Co. v. Penna. Coal Co., 54 Pa. Superior Ct. 380; Philadelphia v. Linnard, 97 Pa. 242; In re Chestnut St., 118 Pa. 593.

The ordinance is not a valid exercise of the police power of the city and is therefore void irrespective of its applicability to Roberts court.

OPINION BY HEAD, J., July 15, 1914:

The opinion filed by the learned judge below fully states the facts out of which this controversy arises and strongly supports the judgment appealed from. It leaves but little for us to add save perhaps to emphasize the narrow limits within which lies the controlling question in the case.

We may assume with the learned counsel for appellant that many of the municipalities in what is called the anthracite region of the state are vitally interested in the broad question discussed with much ability in his brief. We may so assume not only because of our general knowledge of the history of the growth and development of those communities, but also because the legislature by the Act of July 26, 1913, P. L. 1439, has undertaken to provide a plan intended to solve or aid in the solution of that question. But in the case before us the city appellant has not attempted to avail itself of the provisions of that statute. Manifestly then it has no place in the determination of our question, and it would be futile, as well as mischievous, here and now to attempt to construe that act or consider the constitutional powers of the general assembly in dealing with such matters.

Nor need we enter into any exhaustive discussion of the nature or extent of the police power of the state or its agent, the city, over the regular highways of the commonwealth within or without the limits of a municipality. The continued existence and just exercise of

that power are necessary to the maintenance of the life of the state, and consequently can never be abridged. We may agree too that great public emergencies may arise when the just and necessary exercise of that power may involve the destruction of the property of the citizen. Such conditions, fortunately rare, demand the exercise of that force we call vis major, against the destructive effects of which, government has not yet found a way to relieve the citizen. But it has not been considered that the ordaining, laying out or opening of a public street in a city or borough created any such emergency. They are but the ordinary functions of every municipality, great or small, the exercise of which is the daily incident of their development and growth. For the performance of these functions they are given ample power. But this power is to be exercised subject to the provision in the fundamental law that "municipal and other corporations invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by the construction or enlargement of their works, highways or improvements, etc." Thus the streets necessary for the common good and the communal growth may be created, and the property required to make and maintain them may be taken from an individual by due process of law and without injustice to anyone.

These general reflections are but intended to clear the way for an accurate view of the basic proposition on which our judgment rests, viz., that what is known in this record as "Robert's Court" is not and never was a public street of the city of Scranton within the legal meaning of the ordinance under which the defendant was convicted, when that ordinance is construed in the light of the statutes and decisions relating to public streets and highways. Of course by its acceptance of the dedication by the owners of the surface and its subsequent expenditure of public money thereon, the city has lawfully acquired the right, for many pur-

poses, to regard Robert's Court as a public street, and its control over it is commensurate with that right. But the stream cannot rise higher than its source. That right had its origin in the deed of gift from Reynolds & Porter. They never owned the underlying coal. When the owner of the fee split his estate horizontally and sold to them the surface, they, for a valuable consideration, expressly released for themselves and their assigns the right of surface support. After the conveyance to them, the owner of the coal could lawfully mine and remove it just as before the severance. Nothing they could do would be effective to control, interfere with or disturb that right. They could give away their own property but not that of another. Their donee could take what they could give but no more. This would be none the less true because the donee was a city rather than an individual. By its acceptance of that gift, the city did not acquire any control over the property of one who did not join in the deed of gift, and its police power over the property of that person was neither greater than nor different from what it had theretofore been. Because of that gift it could not so exercise its police or punitive power as to restrain the lawful enjoyment of his own property by one who had never joined in the deed of gift; to whose land the actual donors never had any title.

Without attempting to determine how far, either under the exercise of its general police power or under the provisions of the act of 1913, the city of Scranton may lawfully regulate the mining of coal under the surface of its regularly ordained streets, we reach the conclusion that this defendant, conducting the ordinary mining operations of his employer under the surface of Robert's Court, was guilty of no violation of the city ordinance, and the judgment in his favor was properly entered.

Judgment affirmed.